1   **WO**

2

3

4

5

6

7

8

9                      IN THE UNITED STATES DISTRICT COURT

10                        FOR THE DISTRICT OF ARIZONA

11

12   Liberty Life Insurance Company,                    No. CV 10-2024-PHX-JAT

                         Plaintiff,
13                                                       **ORDER**

14   v.

15   Eric L. Myers, et al.,

16                         Defendants.

17

18          Pending before the Court is Liberty Life Insurance Company's ("Liberty Life")

19   Motion to Exclude Purported Expert Opinions of Robert Comeau.   (Doc. 226).

20   Defendants Anne Myers ("Anne"), Erin Myers Stoloff ("Erin"), and Kirsten Myers

21   Ruggiano ("Kirsten") have filed a Response (Doc. 243) and Plaintiff has filed a Reply

22   (Doc. 249).

23   **I.     BACKGROUND**

24          In June 1991, Defendant Eric L. Myers ("Eric") attended a conference in San

25   Diego, California.  Eric did not return to his home in Prescott, Arizona, following the

26   conference.  Investigations into his whereabouts and fate were conducted by the San

27   Diego and Prescott Police Departments.   Eric's father, Defendant Donald Myers

28   ("Donald") also hired a private investigator to find Eric.  All of the investigations were

1  unsuccessful.

2        Prior to disappearing, in 1989, Eric updated and increased his life insurance

3  coverage with Liberty Life.  In 1993, after no sign of Eric had been found, Donald was

4  named a special conservator of Eric's life insurance policy for the purpose of changing the

5  beneficiaries of the policy to Erin and Kirsten.  In 1996, Donald applied for a presumptive

6  death certificate with the State of Arizona after investigations failed to turned up any sign

7  of where Eric was or that he was still alive.  In 1997, a presumptive death certificate for

8  Eric was issued by the State of Arizona.  Days later, Donald submitted a claim to Liberty

9  Life requesting Plaintiff pay the death benefits under Eric's policy.  Liberty Life

10  conducted its own investigation and also concluded that Eric was dead.

11        In 1998, Liberty Life paid $870,103.80 pursuant to the terms of Eric's policy.

12  Donald directed the Death Benefit Proceeds ("Proceeds") to be paid equally to the Erin

13  Myers Trust dated August 13, 1993 and to the Kirsten Myers Trust dated August 13, 1993

14  (collectively the "Trusts").  Donald served as trustee for the Trusts.

15        On October 2, 2007, Eric returned and made his existence known to Donald, Erin,

16  and Kirsten.  As of that date, the Trusts still contained $478,651 between them.  After Eric

17  resurfaced, Donald communicated with Anne, who is a lawyer, about any potential claim

18  Liberty Life may have to the Proceeds left in the Trusts.  Donald came to the conclusion

19  that it was safe to give Erin and Kirsten the remaining Proceeds.  No party informed

20  Liberty Life that Eric was still alive.

21        In January 2008, Donald distributed almost all of the remaining funds in the trusts

22  to Erin and Kirsten.  In April 2009, Donald distributed the remaining funds in the trusts to

23  Erin and Kirsten.  In March 2009, Eric filed a petition to expunge his death certificate with

24  the State of Arizona.  In November 2009, Liberty Life was notified of Eric's existence by

25  the State of Arizona.

26        In September 2010, Liberty Life filed a Complaint (the "Complaint") asserting

27  claims against Eric, Donald, Erin, Kirsten, and the Trusts.  (Doc. 1).  During discovery, on

28  December 2, 2011, Defendants Donald, his wife Joan Myers ("Joan"), and Brooke Myers

1   Wilson who is no longer a party to this case, disclosed that they intend to call Robert
2   Comea, a former business executive in the insurance industry, as an expert witness at trial
3   to offer opinion testimony pursuant to Federal Rules of Evidence 702, 704, and 705.
4   (Doc. 226-1 at 3-4); (Doc. 173).  Liberty Life filed this motion to exclude Mr. Comeau's
5   opinions on March 30, 2012.  (Doc. 226).

6   **II.     DISCUSSION**

7          Federal Rules of Evidence 702, 704, and 705, concern the testimony of expert
8   witnesses.  In Plaintiff's Motion to Exclude Expert Opinion, Liberty Life challenges the
9   admissibility of Mr. Comeau's expert testimony.  (Doc. 226 at 1).   Liberty Life argues
10  that Mr. Comeau's written report dated November 30, 2011 (the "Comeau Report") (Doc.
11  226-1 at 5-51), and any testimony based on the report are inadmissible expert testimony
12  under Federal Rule of Evidence 702.  (Doc. 226 at 1).

13          **A.     Requirements for Expert Testimony**

14          Rule 702 provides:

15               If scientific, technical, or other specialized knowledge will
16          assist the trier of fact to understand the evidence or to
             determine a fact in issue, a witness qualified as an expert by
17          knowledge, skill, experience, training, or education may
             testify thereto in the form of an opinion or otherwise, if (1)
18          the testimony is based upon sufficient facts or data, (2) the
             testimony is the product of reliable principles and methods,
19          and (3) the witness has applied the principles and methods
20          reliably to the facts of the case.

21  Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589
22  (1993) ("*Daubert I*"), the Supreme Court held that Rule 702 imposed a special
23  gatekeeping obligation upon a trial judge to make a preliminary assessment of the
24  admissibility of expert scientific testimony.  Specifically, the Court held that under Rule
25  702, "the trial judge must ensure that any and all scientific testimony or evidence admitted
26  is not only relevant, but reliable."  *Id.* at 589.  In making this determination, the trial court
27  engages in a two-part inquiry.  First, the court must determine whether the expert's
28  testimony reflects "scientific knowledge," that is, "whether their findings are 'derived by

scientific method,' and whether their work product amounts to 'good science.'" *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*").  Second, the court must determine whether the proffered expert testimony is relevant, "i.e., that it logically advances a material aspect of the proposing party's case." *Id.*  Essentially, under *Daubert*, the trial court's task "is to analyze not what experts say, but what basis they have for saying it." *Id.* at 1316.

### 1.      Qualification as Expert

"[T]he question of admissibility only arises if it is first established that the individuals whose testimony is being proffered are experts in a particular [ ] field." *Id.* at 1315.  Thus, as an initial matter, the trial court must determine whether the proffered witness is qualified as an expert by "knowledge, skill, experience, training or education." Fed. R. Evid. 702.  To satisfy this standard, it is essential that "the proposed witness's qualifying training or experience, and resultant specialized knowledge, are sufficiently related to the issues and evidence before the trier of fact [such] that the witness's proposed testimony will be of assistance to the trier of fact."  3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, ¶ 702[04][1][b], p. 702-45 (citing *United States v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000) (finding proposed expert witness's expertise in international finance insufficient to qualify witness to testify regarding authenticity of security instrument)).

### 2.      Reliability

Next, the trial court must ensure that the proffered expert testimony is reliable. Generally, to satisfy Rule 702's reliability requirement, "the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Daubert II*, 43 F.3d at 1316.  Toward this end, the Supreme Court in *Daubert I* set forth the following factors for the trial court to consider when assessing the reliability of proffered expert testimony. First, "a key question to be answered in determining whether a theory or technique is [ ] knowledge that will assist the trier of fact will be whether it can be (and has been) tested."

509 U.S. at 593.  Second, the Court looks at whether the theory or technique has been subjected to peer review and publication.  *Id*.  Because publication in a peer-reviewed journal increases the likelihood that substantive flaws in the technique will be detected, "[t]he fact of publication (or lack thereof) . . . will be a relevant, though not dispositive consideration in assessing the scientific validity of a particular technique or methodology on which an opinion in premised."  *Id*. at 594.  Third, "in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation[.]"  *Id*. (internal citations omitted.)  Fourth, the Court considers the degree of acceptance of the method or technique within the relevant scientific community.  *Id*.  In engaging in this analysis, the trial court should be mindful that:

> The inquiry envisioned by Rule 702 is . . . a flexible one.  Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability–of the principles that underlie a proposed submission.  The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Id*. at 594-95 (footnotes omitted).

It is also well-settled that the four *Daubert* factors—testing, peer review, error rates, and acceptability in the relevant scientific community—are merely illustrative, not exhaustive, and may be inapplicable in a given case.  *Daubert II*, 43 F.3d at 1317.  For instance, the Ninth Circuit has advised that a trial court may also question whether the expert is proposing to testify about matters "growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying" as another significant inquiry weighing on reliability.  43 F.3d at 1317.  "That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method.'"  *Id*.

Accordingly, "[e]stablishing that the an expert's proffered testimony grows out of

1  pre-litigation research or that the expert's research has been subjected to peer review are

2  the two principal ways the proponent of expert testimony can show that the evidence

3  satisfies the first prong of 702." *Id*. at 1318.  Failing this, the proponent may attempt to

4  meet this burden through the testimony of its expert. *Id*. at 1319.  "For such a showing to

5  be sufficient, the experts must explain precisely how they went about reaching their

6  conclusions and point to some objective source—a learned treatise, the policy statement of

7  a professional association, a published article in a reputable scientific journal or the like—

8  to show that they have followed the scientific method, as it is practiced by (at least) a

9  recognized minority of scientists in their field." *Id*.  In other words, "the party proffering

10 the evidence must explain the expert's methodology and demonstrate in some objectively

11 verifiable way that the expert has chosen a reliable scientific method and followed it

12 faithfully." *Id*. at 1319 n. 11.  Merely offering the expert's qualifications, conclusions,

13 and an assurance of reliability is insufficient. *Id*. at 1319.

14              **3.    Relevance**

15              The other component of the trial court's gatekeeping function under Rule 702 is to

16 ensure that the proffered expert testimony is relevant.  As articulated in Rule 702, expert

17 testimony is relevant if it assists the trier of fact in understanding evidence or in

18 determining a fact in issue. *Daubert I*, 509 U.S. at 591.  Thus, the party proffering such

19 evidence must demonstrate a valid scientific connection, or "fit", between the evidence

20 and an issue in the case. *Id*.  "Expert testimony which does not relate to any issue in the

21 case is not relevant, and, ergo, non-helpful." *Id*. (quoting 3 Jack B. Weinstein & Margaret

22 A. Berger, Weinstein's Federal Evidence, ¶ 702[02], p. 702-18).  The Court therefore

23 examines whether the proffered expert testimony is "sufficiently tied to the facts of the

24 case that it will assist the jury in resolving a factual dispute." *Id*. (quoting *United States v.*

25 *Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).  Expert knowledge also assists the trier of

26 fact when it provides knowledge beyond the trier of fact's common knowledge. *Id*.;

27 *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002).

28              Conversely, expert testimony is inadmissible if it concerns factual issues within

1    the knowledge and experience of ordinary lay people, because it would not assist the trier

2    of fact in analyzing the evidence.  In such cases, "[t]he fact finder is . . . fully capable of

3    understanding the evidence and deciding the issues through the use of its common

4    knowledge and common sense."  Weinstein's Federal Evidence, §702.03[2][a], at p. 702-

5    36.  In the Ninth Circuit, "[t]he general test regarding the admissibility of expert testimony

6    is whether the jury can receive 'appreciable help' from such testimony."  *United States v.*

7    *Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986).   Because unreliable and unfairly

8    prejudicial expert witness testimony is not helpful to the trier of fact, the trial court should

9    exclude such evidence.  *Jinro Am. v. Secure Inv., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001).

10   Likewise, expert testimony that merely tells the jury what result to reach is inadmissible.

11   Fed. R. Evid. 704 Advisory Committee Note (1972); *see e.g., United States v. Duncan*, 42

12   F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to

13   reach, this does not aid the jury in making a decision, but rather attempts to substitute the

14   expert's judgment for the jury's.").

15                  **4.    *Kumho Tire's* Expansion of *Daubert I***

16        In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court

17   held that the trial judge's general gatekeeping obligation outlined in *Daubert* not only

18   applies to expert scientific testimony, but to all expert testimony.  It reasoned that neither

19   the language of Rule 702 nor the evidentiary rationale supporting the Court's decision

20   were limited to "scientific" knowledge, and that making the trial court's gatekeeping

21   obligation dependent upon a distinction between "scientific" and "other specialized"

22   knowledge would be unworkable.  *Id*. at 148.  Accordingly, the Court made clear that

23   "*Daubert's* general principles apply to the expert matters described in Rule 702."  *Id*. at

24   149.  Further, the Court held that in determining the admissibility of proffered expert

25   testimony, and in particular, in assessing the reliability of the grounds for such testimony,

26   the trial court may consider one or more of the reliability factors identified in *Daubert*.

27   Thus, when assessing the reliability of a non-scientific expert's testimony, the trial court

28   may ask, for example, how often an expert's skill or experienced-based methodology

1  produces erroneous results, whether the method is generally accepted in the relevant

2  expert community, or whether the expert's preparation would be recognized as acceptable

3  in the expert's field.  *Id.* at 151.  While the trial court should consider the *Daubert* factors

4  when they would be reasonable measures of reliability, the trial court retains the discretion

5  to tailor its reliability determination to suit the facts of a particular case.  *Id.* at 152-53

6  (noting that the law grants the trial judge "broad latitude" in fashioning its reliability

7  inquiry under *Daubert*).

8         **B.**     **Analysis of Mr. Comeau as an Expert**

9       In this case, Liberty Life asserted six claims against Defendants in the Complaint.

10  (Doc. 1).  Five of the claims are against Donald.  These claims include: counts 1, 2, 3, 4,

11  and 5, for a Declaratory Judgment, Fraud, Breach of Duty, Constructive Fraud, and

12  Conversion respectively.  (*Id.* at 10, 11, 16, 17, 18).  According to Donald and Joan's

13  disclosure, Mr. Comeau intends to testify at trial regarding the opinions set forth in the

14  Comeau Report.  (Doc. 226-1 at 3).[1]

15       The Comeau Report contains eleven separate opinions.  (*See* Doc. 226-1 at 5-51).

16  Liberty Life contends these opinions essentially state only four distinct conclusions.  (Doc.

17  225 at 3).  The Court agrees with Plaintiff and finds the Comeau Report principally

18  testifies that: (1) Liberty Life "assumed the risk" that Eric was alive when it paid the

19  Death Benefit Proceeds ("Proceeds") to the beneficiaries, and Liberty Life therefore "is

20  not entitled to recover" the Proceeds; (2) Donald believed Eric was dead and therefore

21  acted appropriately in submitting his claim to Liberty Life for payment of the Proceeds;

22  (3) Liberty Life's losses in paying the Proceeds should be reduced by the reinsurance

23  coverage payments it received; and (4) Liberty Life unreasonably delayed its handling and

24  investigation of the claim submitted by Donald before paying the Proceeds.  (Doc. 226 at

25  
26  
27  
28  

---

[1] It is unclear to the Court why Defendants Donald Myers and Joan Myers, the parties that made the disclosure and the only parties able to call Mr. Comeau as an expert witness, are not the parties to respond to Plaintiff's motion here. (*See* Doc. 243). Defendants Anne, Erin, and Kirsten are the parties that responded to Plaintiff's motion. (*Id.* at 1). Plaintiff has not moved to challenge the Response based on standing, instead addressing the Response on its merits because the Response presumably raises the same arguments that Donald and Joan would raise. The Court will do the same.

1    3).

2           Defendants argue that Mr. Comeau is qualified to testify as an expert and that his

3    opinions are neither legal conclusions nor based on speculation.  (Doc. 243 at 4-13).

4           Under the expansion of *Daubert I* in *Kumho*, as explained above, the Court finds

5    that the analysis in *Daubert I* applies to Mr. Comeau's testimony.  The Court then looks to

6    the factors established in *Daubert I*.

7                          **1.     Qualification as an Expert**

8           Defendants proffer Mr. Comeau's as an expert on the processing of life insurance

9    claims and thoroughly explain his qualifications.   (Doc. 243 at 4-8).  Plaintiff concedes

10   that Mr. Comeau does not lack sufficient qualifications to testify regarding the handling of

11   life insurance claims.  (Doc. 249 at 1).  Accordingly, the Court finds Defendants have

12   established that Mr. Comeau is qualified to testify as an expert on how to process life

13   insurance claims.

14                              **2.     Reliability**

15          The Court must determine next whether the process Mr. Comeau used to make his

16   decisions was reliable.  *See Daubert II*, 43 F.3d at 1316 ("the party presenting the expert

17   must show that the expert's findings are based on sound science, and this will require

18   some objective, independent validation of the expert's methodology").  Plaintiff argues

19   that Mr. Comeau's opinions, that Donald believed Eric was dead and therefore acted

20   appropriately in submitting his claim to Liberty Life for payment of the Proceeds and that

21   Donald knew Eric was alive several years before he resurfaced in 2007, are based on

22   speculation. (Doc. 226 at 9).  This generalization of Mr. Comeau's opinions encompasses

23   Opinions 1, 2, 3, and 10 of the Comeau Report.  (Doc. 226-1 at 26-29).  This argument by

24   Plaintiff impeaches the reliability of Mr. Comeau's findings and how he arrived at his

25   conclusions.

26           "[T]he party proffering the evidence must explain the expert's methodology and

27   demonstrate in some objectively verifiable way that the expert has chosen a reliable

28   scientific method and followed it faithfully."  *Daubert II*, 43 F.3d at 1319 n.11.  Offering

1   the expert's qualifications, conclusions, and an assurance of reliability is insufficient.  *Id*.

2   at 1319.

3       Mr. Comeau makes it clear in his report how he arrived at the conclusions

4   embodied in opinions 1, 2, and 3 of the Comeau Report.  (Doc. 226-1 at 26-29).  As

5   Plaintiff conceded, Mr. Comeau is an expert in how life insurance claims are processed.

6   Mr. Comeau explained that he arrived at these conclusions by looking at how the claim

7   was filed.  Mr. Comeau considered the steps the insurance company and Donald took in

8   processing the claim.  Mr. Comeau did far more than offer his qualifications, conclusions,

9   and an assurance of reliability.  The Court finds "how" Mr. Comeau arrived at Opinions 1,

10  2, and 3 satisfies the standard for reliability in *Daubert I*.

11      Opinion 10 of the Comeau Report is another matter.  Opinion 10 purports that

12  "[t]he faxes received and e-mails starting over five years after Liberty paid the claim do

13  not give Liberty any right to recover amounts it paid."  (Doc. 226-1 at 46).  In looking at

14  how Mr. Comeau arrived at this conclusion, the Court finds this opinion was arrived at by

15  an evaluation of the evidence and not by applying Mr. Comeau's expert knowledge of the

16  claims process.  Determining whether Donald knew Eric was alive prior to 2007 is a

17  question for the trier of fact.  Whether Liberty Life had a right to recover if Donald knew

18  Eric was alive is a question of law.  Liberty Life's right to recover has no relation to Mr.

19  Comeau's expertise in how to process a life insurance claim.  Nor did Defendants or Mr.

20  Comeau make it clear how he used that expertise to arrive at his conclusion in Opinion 10.

21  Opinion 10 ventures beyond how to process a life insurance claim.  Under the standard in

22  *Daubert*, the Court finds Opinion 10 fails for reliability.

23                      **3.    Relevance**

24      Finally the Court must determine relevance.   Relevance means the expert

25  testimony helps the trier of fact to understand the evidence or determine a fact in issue.

26  *See* Fed. R. Evid. 702.  Legal conclusions are not relevant for an expert witness to solely

27  testify about.  Because unreliable and unfairly prejudicial expert witness testimony is not

28  helpful to the trier of fact, the trial court should exclude such evidence.  *Jinro Am. v.*

1   *Secure Inv., Inc.*, 266 F.3d at 1004.  Defendants argue that under Rule 704 expert

2   testimony that is "otherwise admissible is not objectionable because it embraces an

3   ultimate issue to be decided by the trier of fact."  (Doc. 243 at 8).  This is a true statement

4   of the rule, however, expert testimony that merely tells the jury what result to reach is

5   inadmissible.  Fed. R. Evid. 704 Advisory Committee Note (1972).  "When an expert

6   undertakes to tell the jury what result to reach, this does not aid the jury in making a

7   decision, but rather attempts to substitute the expert's judgment for the jury's."  *United*

8   *States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).  "An expert witness cannot give an

9   opinion as to her legal conclusion—i.e., an opinion on an ultimate issue of law."

10  *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).

11          Plaintiff argues that Mr. Comeau's opinions asserting that Liberty Life is barred

12  from recovering the Proceeds are irrelevant because they are legal conclusions (Opinions

13  4, 5, 6, 7, and 11 in the Comeau Report).  Further, Liberty Life contends that Mr.

14  Comeau's opinions stating Liberty Life's net losses should be considered by the jury

15  (Opinion 8) and that Liberty Life delayed its investigation into Eric's disappearance

16  (Opinion 9) are irrelevant because neither opinion relates to a disputed issue.  (Doc. 249 at

17  2, 8, 9).

18                          **a.      Opinions 1, 2, and 3**

19          The Court has already determined that the methodology for Opinions 1, 2, and 3

20  satisfied the standard in *Daubert*.  The Court now turns to the relevance of these opinions.

21  As explained above, these opinions in summary conclude that Donald believed Eric was

22  dead and therefore acted appropriately in submitting his claim to Liberty Life for payment

23  of the Proceeds.  (Doc. 226-1 at 26-29).

24          The Court finds Opinions 1, 2, and 3 are all irrelevant under *Daubert*.  As

25  explained, Mr. Comeau is an expert in the claims process.  In this case, however, Liberty

26  Life's claims process is not in issue.  No one has accused Liberty Life of bad faith or

27  negligence in their claims process.  Opinions 1, 2, and 3, attempt to explain to the trier of

28  fact that Donald believed Eric was dead.  The Court declines to allow Mr. Comeau's

1    opinions to become a substitute for the facts when they should merely help the trier of fact

2    determine a fact in issue.  Whether Donald appropriately submitted his claim to Liberty

3    Life is not in issue, therefore, Opinions 1, 2, and 3 are not relevant.

4                    **b.    Opinions 4, 5, 6, 7, and 11**

5            Mr. Comeau concludes in Opinions 4, 5, 6, 7, and 11, that Liberty Life "assumed

6    the risk" that Eric was alive when it paid the Proceeds to the beneficiaries, and Liberty

7    Life therefore "is not entitled to recover" the Proceeds.  The Court finds these opinions in

8    Mr. Comeau's report are all conclusions of law and therefore fail the relevance factor of

9    *Daubert*.

10           Opinion 4 states "Liberty assumed the risk that Eric was actually alive when it

11   paid the benefits."  This opinion is based on faulty conclusions of law and the opinion

12   itself is a conclusion of law.  Mr. Comeau couches his methodology for how he arrived at

13   his conclusion as explanations of how the insurance industry functions.  However, his

14   explanations are still nothing more than legal conclusions.  For instance, Mr. Comeau

15   states "[o]nce a claim is paid and the monies are accepted by the appropriate beneficiaries,

16   the insurance company has no recourse to try to recover based upon new information it

17   later obtained."  (Doc. 226-1 at 34).  This is legal conclusion and more importantly simply

18   not a true statement.  It is well established that when life insurance proceeds are paid and

19   the insured later turns up alive courts have allowed insurance companies to recover from

20   the beneficiaries.  *See, e.g.*, *Prudential Ins. Co. v. Harris*, 748 F. Supp. 445, 448 (M.D. La.

21   1990); *Pilot Life Ins. Co. v. Cudd*, 36 S.E. 2d 860, 865 (S.C. 1945).  Further, when an

22   insurance payment is "induced by fraud or material misrepresentation [it] is subject to

23   rescission and restitution.  The transferee is liable in restitution as necessary to avoid

24   unjust enrichment."  Restatement (Third) of Restitution & Unjust Enrichment § 13.  Mr.

25   Comeau's explanation here is symptomatic of the reasoning supporting Opinion 4.  The

26   Court finds Opinion 4 is nothing more than a conclusion of law and therefore fails the

27   relevance standard of *Daubert*.

28           Opinion 5 states "Liberty was aware that certain individuals believed that Eric was

not dead at the time Liberty paid such claim; therefore, Liberty assumed the risk that Eric was actually physically alive." (Doc. 226-1 at 35). Mr. Comeau bases this opinion on the observation that numerous levels of executives were involved in the approval of Donald's claim and chose not to deny the claim. (*Id*.) Mr. Comeau makes a leap in relevance from explaining how Liberty Life made its decision, which is within his expertise, to opining "therefore, Liberty assumed the risk that Eric was actually physically alive." (*Id*.) This is a conclusion of law and for the jury to determine. Therefore, the Court finds Opinion 5 also fails the relevance standard of *Daubert*.

Opinion 6 states "Liberty is not entitled to recover the death benefits paid in 1998." (*Id*. at 36). This opinion is apparently based on Mr. Comeau's belief that Liberty Life did not investigate Eric's disappearance thoroughly prior to paying the Proceeds. (*Id*. at 36-37). Mr. Comeau is entitled to this belief and given his experience he may be able to argue that Liberty Life's investigation did not meet the standard he would have set. However, Opinion 6 focuses more on the ultimate issue in this case—whether Plaintiff is entitled to recover the death benefit proceeds—than it does on helping the trier of fact determine the evidence or a fact in issue. Some of Mr. Comeau's reasons supporting Opinion 6 are observations of the claim process. However, in the Court's discretion as gatekeeper the Court finds the majority of the reasoning supporting Opinion 6 and the ultimate conclusion of Opinion 6, similar to Opinion 4, are legal conclusions couched as explanations. Accordingly, the Court finds Opinion 6 is also a conclusion of law and not relevant for the trier of fact.

Opinion 7 states "Donald Myers, as Trustee of the Trusts, was under no obligation to return to Liberty any of the insurance proceeds remaining when Eric publicly surfaced on October 2,2007—over nine years after Liberty paid the benefit which funded the Trusts." (*Id*. at 38). Mr. Comeau's conclusion here to an ultimate issue in this case is buttressed by three sentences that say the same thing. As explanation for his conclusion, Mr. Comeau states "[i]n the absence of fraud, once Liberty paid the monies, such monies belonged to the policy beneficiaries." (*Id*.) This is a statement of law and has nothing to

do with Mr. Comeau's expertise in the process of adjudicating insurance claims.  The Court finds Opinion 7 is nothing more than a legal conclusion and a determination for the jury to make.

Opinion 11 states "Liberty's demand for return of the monies it paid is groundless. For Liberty to now try to recover monies it paid on a claim in 1998 based upon new evidence that was first acquired by the beneficiaries in 2007 is contrary to life insurance custom and practice."  (*Id*. at 48).  The Court finds this statement and the reasoning supporting it are a string of incorrect and irrelevant legal conclusions punctuated by the statement "Liberty's current actions to relentlessly pursue recovery of its inflated damages are not consistent with life insurance industry custom and practice—but reflect a lack of good faith and fair dealing expected from a life insurance company."  (*Id*. at 50).  While this statement purports to summarize the insurance industry's customs and practices, this final statement does not save an otherwise irrelevant opinion.

Mr. Comeau's conclusion, that it is contrary to life insurance custom and practice for an insurance company to try to recover monies it paid years ago because new evidence has surfaced is not only a conclusion that does not help the trier of fact understand evidence but it is are legally and factually inaccurate.  Insurance companies can recover mistakenly paid insurance payments years after the payment was made.  *See Pilot Life Ins*., 36 S.E. 2d at 865.  Further, insurance companies can surly recover insurance payments induced by fraud.  *See* Restatement (Third) of Restitution & Unjust Enrichment § 13.

Mr. Comeau reasons, "[o]nce the insurance company makes its decision that it has sufficient evidence that the applicant is 'insurable' and issues the life insurance policy, it cannot come back years later and void its decision based upon new facts or a correction of the information it previously relied upon when accepting the risk."  (*Id*. at 49).  Mr. Comeau also explains, "[t]he insurance company assumes the risk that it issued a life insurance policy on a person who actually may not be 'insurable' based upon the real health of the individual." (Doc. 226-1 at 49).  As far the Court is aware, there is no issue

in this case of whether Eric was ever insurable.  These statements are characteristic of the reasoning supporting Opinion 11.  They are irrelevant to any fact in issue.  Therefore, the Court finds Opinion 11 is irrelevant under *Daubert*.

### c.    Opinion 8

Opinion 8 states "Liberty is claiming over $2 million in damages.  There is no way that Liberty's loss, due to its own business practices and decisions are even close to such a figure."  (*Id.* at 39).  Mr. Comeau explains how Liberty Life was reinsured by Life Re and Lincoln National Re after paying the Proceeds. While this opinion certainly falls within Mr. Comeau's expertise in the insurance industry, the Court finds this opinion does not address an issue in this case or help the trier of fact understand a fact in issue.  Defendants appear to be trying to testify about mitigation of potential damages.  The amount that Liberty Life was reinsured is not in dispute.  The Court finds this opinion is highly prejudicial.  Because unfairly prejudicial expert witness testimony is not helpful to the trier of fact, the trial court should exclude such evidence.  *Jinro Am.*, 266 F.3d at 1004. Consequently, the Court finds Opinion 8 is also irrelevant.

### d.    Opinion 9

Opinion 9 states,

> After initially receiving the claim for benefits on April 3, 1997, Liberty took an extremely long time to adjudicate the claim.  Such delay increased Liberty's exposure for failure to exercise good faith and follow fair claim practices in dealing with the claimant, Donald Myers.  Liberty should have been concerned about potential damages because of their bad faith handling of this claim.  Liberty's decision to finally pay the claim in February 1998 was to limit its exposure to potential damages.

(Doc. 226-1 at 40).  How long Liberty Life waited to investigate and pay the claim is not an issue in this case.  No party has made the claim that Liberty Life acted in bad faith. Liberty Life paid the claim at face value on its mistaken belief that Eric was dead. Defendants have not explained, nor does the Court see how this opinion will help the jury determine a fact in issue or what that fact could be.  Accordingly, the Court finds this

1  Opinion is irrelevant under *Daubert*.

2  **V.      CONCLUSION**

3          Based on the foregoing,

4          **IT IS ORDERED** granting Plaintiff's Motion to Exclude Expert Opinions of

5  Robert Comeau.  (Doc. 226).  Specifically, the Court grants Plaintiff's request to exclude

6  Mr. Comeau's testimony to Opinions 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11 contained in the

7  Comeau Report.

8          Dated this 11th day of February, 2013.

9

10

11

12  _____

13  James A. Teilborg
    United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28