**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Liberty Life Insurance Company,<br><br>          Plaintiff,<br><br>v.<br><br>Eric L. Myers, et al.,<br><br>          Defendants. | No. CV 10-2024-PHX-JAT<br>**ORDER** |

Pending before the Court is Plaintiff Liberty Life Insurance Company's ("Liberty Life") Motion for Partial Summary Judgment ("Motion").  (Doc. 228).  Plaintiff has also filed a Statement of Facts in Support of their Motion.  (Doc. 229).

On September 21, 2010, Liberty Life filed a Complaint against Defendants alleging six counts.  (Doc. 1).  Plaintiff's Motion requests summary judgment on three of the counts alleged in the Complaint against four defendants.   Liberty Life requests summary judgment on its fraud claim against Defendant Eric L. Myers ("Eric") (Count Two, Doc. 1 at 11-15); on its unjust enrichment claim against Defendants Erin Sarah Stoloff ("Erin") and Kirsten Anne Ruggiano ("Kirsten") (Count Six, Doc. 1 at 19-20); and on its conversion claim against Defendant Donald D. Myers ("Donald") (Count Five, Doc. 1 at 18-19).

Eric has filed a Response (Doc. 250) opposing Plaintiff's Motion and an accompanying Statement of Facts (Doc. 250-1) and exhibits (Doc. 250-2; Doc. 250-3).

1    Erin and Kirsten have filed a Response (Doc. 253) and a Statement of Facts in support
2    (Doc. 254).  Donald has also filed a Response (Doc. 251) opposing Plaintiff's Motion and
3    a Statement of Facts in support (Doc. 252).

4        Finally, Liberty Life has filed a Reply (Doc. 261) and a Supplemental Statement
5    of Facts (Doc. 262) and Exhibits (Doc. 262-1).

6    **I.    BACKGROUND**

7        In 1989, Eric updated and increased the coverage on his life insurance policy with
8    Liberty Life to $800,000.  In June 1991, Eric attended a real estate conference in San
9    Diego, California.  Eric did not return to his home in Prescott, Arizona, following the
10   conference.  Following Eric's disappearance investigations were conducted by the San
11   Diego Police Department and the Prescott Police Department, neither investigation
12   turned up any sign of Eric or what happened to him.  Donald also hired a private
13   investigator to find Eric or evidence of what happened to him and Donald's investigator
14   was also unable to find anything regarding Eric.

15       After disappearing Eric began using the aliases Chaz Olsen and Chaz Lung to
16   conceal his identity.  After two years without hearing from Eric, in 1993, Donald applied
17   to the Maricopa County Superior Court to be named the special conservator of Eric's life
18   insurance policy in order to rename the beneficiaries of the policy as Erin and Kirsten.
19   Eric's life insurance policy was then changed by Donald and Erin and Kirsten were
20   named the beneficiaries.  In 1996, with no evidence of Eric's survival, Donald petitioned
21   the Maricopa County Superior Court to issue a presumptive death certificate.  In 1997, a
22   presumptive death certificate was issued by the State of Arizona.  In March 1997, Donald
23   submitted a claim of death to Liberty Life requesting Plaintiff pay the Death Benefit
24   Proceeds ("Proceeds") under Eric's life insurance policy.  Liberty Life then hired its own
25   investigator to investigate the claim.  After investigating the claim, Liberty Life
26   concluded that the available evidence demonstrated that Eric was dead.

27       In February 1998, Liberty Life paid $870,103.80 pursuant to the terms of Eric's
28   policy equally to the Erin Myers Trust dated August 13, 1993 and the Kirsten Myers

1   Trust dated August 13, 1993 (collectively the "Trusts").  Donald served as the trustee for

2   the trusts.  Until October 2, 2007, Donald disbursed the Proceeds from the Trusts to Erin

3   and Kirsten pursuant to the terms of the trust agreement.

4          On October 2, 2007, Eric reappeared and made his presence known to Donald,

5   Erin, and Kirsten.  As of October 2, 2007, the Trusts contained $478,651.  From the time

6   Eric disappeared in 1991 until he reappeared in 2007, he had moved between Mexico,

7   California, and British Columbia.

8          After Eric resurfaced, Donald communicated with Eric's former wife (Erin and

9   Kirsten's mother) Anne R. Myers ("Anne"), who is an attorney, about any possible claim

10  Liberty Life had to the remaining Proceeds.  Erin also sent Donald emails requesting that

11  he liquidate the remaining funds in Trusts to her and Kirsten.  On October 19, 2007,

12  Donald came to the conclusion and told Anne in an email, "I think we are safe to give the

13  girls their trust money."  On January 25, 2008, Donald distributed all of the funds in the

14  Trusts except for a small amount to cover taxes to Erin and Kirsten.  On April 15, 2009,

15  Donald distributed the remaining assets in the Trusts to Erin and Kirsten.  On November

16  17, 2009, Eric expunged his Death Certificate with the Maricopa County Superior Court

17  and at that time Liberty Life was notified for the first time that Eric was alive.

18         On September 21, 2010, Liberty Life filed this action.  (Doc. 1).

19  **II.    DISCUSSION**

20         Liberty Life's Motion requests summary judgment under Federal Rule of Civil

21  Procedure 56(a) on three of the six counts alleged in the Complaint.  (Doc. 228 at 1).

22  Summary judgment is only appropriate when "the movant shows that there is no genuine

23  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

24  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed

25  must support that assertion by . . . citing to particular parts of materials in the record," or

26  by "showing that materials cited do not establish the absence or presence of a genuine

27  dispute, or that an adverse party cannot produce admissible evidence to support the fact."

28  *Id*. 56(c)(1)(A)&(B).  Thus, summary judgment is mandated "against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id*. at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id*. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). In the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248 (1986). A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Id*. at 248. A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id*.

At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id*. at 249-250. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. *Id*.

## III.    FRAUD CLAIM AGAINST ERIC

Liberty Life claims Eric committed fraud by intentionally disappearing and concealing his identity, which caused Liberty Life to pay a total of $870,103.80 in Death

Benefit Proceeds on a life insurance policy that Eric had taken out with Liberty Life prior to disappearing.  (Doc. 1 at 11-15); (Doc. 228 at 2).  Liberty Life asks the Court to grant summary judgment on this claim and seeks the full $870,103.80 as damages.  (Doc. 228 at 2).

While the tort of fraud has been addressed by Arizona courts, the unique facts of this case have not been analyzed under a claim of fraud by prior Arizona courts.

> In the absence of controlling statutory or case authority, Arizona courts generally follow the Restatement of the Law on a particular subject if its position, as applied to the claim at issue, "is logical, furthers the interests of justice, is consistent with Arizona law and policy, and has been generally acknowledged elsewhere." *Ramirez v. Health Partners of S. Ariz.*, 972 P.2d 658, 665 (Ariz. Ct. App. 1998) (citing *Ft. Lowell–NSS Ltd. P'ship v. Kelly*, 800 P.2d 962 (Ariz. 1990); *Cannon v. Dunn*, 700 P.2d 502, 503 (Ariz. Ct. App. 1985)). Further, Arizona courts routinely look to guidance from courts of other states on matters of first impression. *See, e.g., Tritschler v. Allstate Ins. Co*., 144 P.3d 519, 527 (Ariz. Ct. App. 2006) (citing *Hull v. DaimlerChrysler Corp*., 99 P.3d 1026, 1028 (Ariz. Ct. App. 2004)).

*Freeman v. Sorchych*, 245 P.3d 927, 932 (Ariz. Ct. App. 2011), review denied (Aug. 31, 2011).  Under Arizona law, "there are three distinct classes of fraud: misrepresentation, concealment, and non-disclosure."  *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 34 n. 22 (Ariz. 2002).  "Arizona recognizes the tort of fraudulent concealment."  *Id*. at 34 (citing Restatement (Second) of Torts § 550).  Liberty Life contends Eric is liable for fraudulently concealing his survival.  (Doc. 1 at 12); (Doc. 228 at 9); (Doc. 261 at 2).

As the Arizona Supreme Court explained, "[l]iability for fraudulent concealment occurs under § 550 of the Restatement (Second) of Torts and lies against a party to a transaction who by *concealment or other action intentionally* prevents the other from acquiring material information."  *Wells Fargo*, 38 P.3d at 34 n. 22 (emphasis in original).  Fraudulent concealment is not predicated on the existence of a duty to make the injured party aware of material facts.  *Id*. ("duty has no relevance in a tort requiring an intentional

1  act").  It is irrelevant that the concealment was not directed toward the injured party.  If a

2  party intends to conceal information and the concealment prevents the other party to a

3  transaction from acquiring material information, the concealing party is liable.  *See id*.

4  (citing Restatement (Second) of Contracts § 160 ("Action intended or known to be likely

5  to prevent another from learning a fact is equivalent to an assertion that the fact does not

6  exist")).

7      While Arizona courts have not addressed these unique circumstances, federal

8  courts in the Eastern District of Arkansas, applying Arkansas law, and the Eighth Circuit

9  Court of Appeals have addressed this very issue in a case with almost identical material

10  facts to the case at bar.  *See also New York Ins. Co. v. Nashville Trust Co*., 292 S.W.2d

11  749, 754 (Tenn. 1956).  In *Southern Farm Bureau Life Insurance Company v. Burney*,

12  759 F.2d 658 (8th Cir. 1985), the Eighth Circuit Court of Appeals affirmed the district

13  court and held that where an insured's deliberate acts, including a continuous course of

14  misrepresentation of his own identity, created a situation that led directly to payments by

15  insurer to beneficiaries of his life policies, the insurer could recover the amounts paid.  In

16  *Burney*, the defendant was facing financial difficulties and in June 1976, he took

17  advantage of the commotion of a car wreck he was in and slipped into a nearby river and

18  swam away.  *S. Farm Bureau Life Ins. Co. v. Burney*, 590 F. Supp. 1016, 1018 (E.D. Ark.

19  1984).  The defendant never returned home to Helena, Arkansas, never contacted his wife

20  or kids, never contacted creditors, the state, or any other entity.  *Id*.  The defendant

21  simply disappeared and settled in Key Largo, Florida.  *Id*.   From the night he

22  disappeared, the defendant assumed a new identity and left the impression he was

23  deceased.  *Id*.  Prior to disappearing the defendant had entered into two life insurance

24  policies with the plaintiff insurance company.  *Id*.  After at least two investigations, the

25  plaintiff paid out $470,000 in life insurance proceeds to beneficiaries of policies on the

26  defendant's life.  *Id*. at 1019.   The defendant then resurfaced after six years and the life

27  insurance company made a claim for fraud.  *Id*. at 1018.

28      In Arkansas, fraud consists of the misrepresentation or concealment of a material

fact calculated to deceive and mislead.  *Id*.  The defendant argued that he was not guilty of fraud because his deception had no bearing on the payment of the insurance proceeds and that he received none of the proceeds paid.  *Id*. at 1018-19.  In applying Arkansas law, the district court found that the defendant "was a knowing, participating party to every insurance contract" and his fraud "permeated the relationships of all the parties to the degree that any payment or agreement accepted by the parties was a result of the deliberate deception practiced by the insured."  *Id*. at 1019.  The district court held the defendant liable to the insurer for the amounts paid under the policies at issue.  *Id*. at 1016.

The Court of Appeals noted that it was irrelevant that the insured simply went away and made no false representation to the insurance company or to anyone from where he left.  *Burney*, 759 F.2d at 658.  It was the deliberate act of disappearing and a continuous course of leading another life and misrepresenting his own identity that "created the situation that led directly to the payments by the [insurance] company."  *Id*. at 659.

In this case, similar to the insured in *Burney*, prior to disappearing Eric was a participating party to an insurance contract.  In 1989, Eric applied for and was issued an updated life insurance policy with Liberty Life for $800,000.  (Doc. 229-1 at 7-13).  Like the circumstances in *Burney*, Eric made the conscious decision to disappear in 1991.  The motives behind Eric's decision are irrelevant to Liberty Life's claim.  For sixteen years Eric intentionally concealed and misrepresented his identity.  (Doc. 229-5 at 7 ¶ 30).  Eric's concealment was so successful that investigations by the San Diego Police Department, the Prescott Police Department, a private investigator hired by Donald, and an investigator hired by Liberty Life, failed to uncover any existence of Eric's survival.  (Doc. 229 at 2-3); (Doc. 229-3 at 11-12, 19-20, 34).

Like *Burney*, Eric's actions created the situation that led directly to the payments by Liberty Life.  Eric's disappearance and his family's inability to find any evidence of his existence caused the Arizona Superior Court to appoint Donald as special conservator

for Eric's estate in 1993, for the specific purpose of modifying the beneficiaries of Eric's life insurance policy to be his children, Erin and Kirsten.  (Doc. 229-3 at 31, 38); (Doc. 262-1 at 2-7).  Contrary to Eric's argument, the state's action does not alleviate Eric of liability, but for Eric's intentional concealment no special conservator would have been appointed.  After five years of Eric concealing his existence, the State of Arizona issued a presumptive death certificate in 1996.  (*See id*. at 2, 43-47).  Pursuant to Arizona Revised Statute § 14-1107, for the death certificate to be issued Eric's death had to be established by clear and convincing evidence.  (*Id*. at 42).  In 1998, Eric's concealment directly lead Liberty Life to pay out $870,103.80 in death benefit proceeds pursuant to the terms of the policy that Eric was a party to, policy number XF10188752.  (Doc. 229-2 at 87-90).

Like the defendant in *Burney*, Eric "designed every relevant phase of his life to deceiving everyone, including [the] insurance compan[y]."  *Burney*, 590 F. Supp. at 1018.  As the district court found in *Burney*, it was irrelevant that Eric did not receive any of the proceeds Liberty Life paid for his presumed death.  Contrary to Eric's argument against liability, any differences between the life insurance policies in *Burney* and the policy in this case are also irrelevant.  What is relevant is that Eric was a party to a life insurance policy.  Eric concealed his existence and actively led the public to believe Eric L. Myers was dead.  Eric knew of the policy when he updated it in 1989.  Further, Eric knew of the policy after he disappeared, evinced by his statement in his fax to Donald.  (*See* Doc. 229-4 at 13) ("YEARS LATER I CAME TO THE CONCLUSION THAT (even with no dead body) MY LIFE INSURANCE MUST HAVE PAID OUT") (capital letters in original).  Eric had every right to cease communicating with his family.  Eric did not have a right to fraudulently, in his own words, "CHOOSE SUICIDE" and "TO DISAPPEAR FOREVER," nor did he have the right to continue to foster the deception after entering into a contract for life insurance with Plaintiff.  (*Id*.) (capital letters in original).

The Court finds there is no genuine dispute as to any material facts.  These facts show that Eric was a party to the life insurance contract who by intentionally concealing

his existence prevented Liberty Life from acquiring material information during its investigation into Eric's death.  Under Arizona law and § 550 of the Restatement (Second) of Torts this establishes Eric's liability for fraudulent concealment. Accordingly, the Court finds Liberty Life is entitled to summary judgment as a matter of law on its claim of fraud against Eric.

## IV.   UNJUST ENRICHMENT CLAIM AGAINST ERIN AND KIRSTEN

Liberty Life claims Erin and Kristen are liable for unjust enrichment for the amount of the Proceeds that was transferred to them after they knew Eric was alive. (Doc. 228 at 9-10).  Liberty Life asks the Court to grant summary judgment on this claim and seeks restitutionary relief.  (*Id*. at 16).

A claim of unjust enrichment under Arizona law has five elements: "(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law."  *Freeman v. Sorchych*, 245 P.3d at 936 (citing *City of Sierra Vista v. Cochise Enters*., Inc., 697 P.2d 1125, 1131–32 (Ariz. Ct. App. 1984)).  "In order to be granted restitution, [a plaintiff] must demonstrate that [the defendant] received a benefit, that by receipt of that benefit [the defendant] was unjustly enriched at [plaintiff's] expense, and that the circumstances were such that in good conscience [defendant] should make restitution."  *Pyeatte v. Pyeatte*, 661 P.2d 196, 202 (Ariz. Ct. App. 1982).  "'However, the mere receipt of a benefit is insufficient' to entitle a plaintiff to compensation.  Instead, for an award based on unjust enrichment, a plaintiff must show 'that it was not intended or expected that the services be rendered or the benefit conferred gratuitously, and that the benefit was not conferred officiously.'"  *Freeman*, 245 P.3d at 936-37 (citing *Murdock–Bryant Constr., Inc. v. Pearson*, 703 P.2d 1197, 1202 (Ariz. 1985).

Looking at the elements of an unjust enrichment claim in Arizona, the Court finds Liberty Life has established that Erin and Kirsten were enriched by the $478,651 left of the Proceeds that was transferred to them after they became aware Eric was alive.

Plaintiff has established that it was impoverished by paying out $870,103.80 for Eric's death even though Eric was not dead.  Plaintiff has established the connection between the $870,103.80 that was originally put in trust for Erin and Kirsten and the $478,651 left from that amount that was transferred to them after they became aware Eric was alive.  Finally, no remedy is provided by law for this unjust enrichment claim.  The only element of Plaintiff's unjust enrichment claim disputed by the parties is element (4): the absence of justification for the enrichment and impoverishment.

Erin and Kirsten argue that remaining questions of material fact exist on the absence of justification precluding summary judgment.  (Doc. 253 at 9).   The alleged enduring questions are: (1) whether Liberty Life made a voluntary payment in the face of recognized uncertainty; (2) whether liberty Life acted in conscious ignorance of the facts; and (3) where the allocation of risk of mistake should be placed in good conscience.  (Doc. 253 at 9).  Defendants' questions all center on an alleged *recognized uncertainty* of Eric's death when Liberty Life paid the Death Benefit Proceeds.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  *Anderson*, 477 U.S. at 247-248.  The Court disagrees with Defendants that these questions exist and that questions of material fact remain precluding summary judgment.

Neither the parties nor the Court have found Arizona precedent directly addressing an insurer's recovery of insurance proceeds paid upon a certificate of presumptive death following the insured's reappearance.  As discussed above, "[i]n the absence of controlling statutory or case authority, Arizona courts generally follow the Restatement of the Law . . . . Further, Arizona courts routinely look to guidance from courts of other states on matters of first impression."  *Id*. at 932.

Defendants have turned to the Restatement (Third) of Restitution and Unjust Enrichment to support the presence of their questions of material fact.  (Doc. 253 at 5-9).  This Restatement and ample examples of case law cited by Plaintiff, however, support

1    the opposite contention, and establish the absence of justification for the enrichment and
2    impoverishment in this case.

3         The Restatement (Third) of Restitution and Unjust Enrichment identifies specific
4    rules developed and used by courts for claims of unjust enrichment instead of relying on
5    general principles of unjust enrichment.  Restatement (Third) of Restitution & Unjust
6    Enrichment ch. 2, topic 1, intro. note (2011).  Section 5 states the general rule, that "[a]
7    transfer induced by invalidating mistake is subject to rescission and restitution.  The
8    transferee is liable in restitution as necessary to avoid unjust enrichment.  Particular
9    instances of restitution for mistake are described in §§ 6–12 and 34."  *Id*. at § 5.  As the
10   general rule states, section 6 "Payment of Money Not Due," illustrates specific
11   applications of the general rule outlined in section 5.  *Id*. at §§ 5-6.  Defendants'
12   arguments are based on their interpretation of sections 5 and 6.  (Doc. 253 at 6-9).

13        **A.    The Voluntary Payment Rule is Inapplicable because it depends
14             on Recognized Uncertainty**

15        Section 6 states that "[p]ayment by mistake gives the payor a claim in restitution
16   against the recipient to the extent payment was not due."  Restatement (Third) of
17   Restitution & Unjust Enrichment § 6.  Comment *a* explains that a payment by mistake
18   "gives rise to a *prima facie* claim of restitution."  *Id*. at § 6 cmt. a.  Comment *a*, however,
19   also recognizes that a few factors, such as a payment made pursuant to a compromise or
20   when the payor assumes the risk of uncertainty, limit the recovery of restitution.  *Id*.
21   (citing Comment *e* relied on by Defendants).  Defendants argue that these factors are
22   present in this case.

23        Comment *f* of Section 6 illustrates when insurers are entitled to recover a payment
24   of money not due.  Comment *f* recognizes that insurance payments of money not due fall
25   between two competing policies.  *Id*. at § 6 cmt. f.  "On the one hand, a policy favoring
26   the prompt payment of claims is furthered by the liberal availability of restitution."  *Id*.
27   On the other, insurance payments create an enhanced interest in their finality for the
28   recipients.  *Id*.  A policy that favors the finality of insurance transactions is antagonistic

to the availability of a claim of restitution. *Id*. The facts of the cases will strongly influence which policy to favor in any given case. *Id*. When the facts show either a contractual risk allocation *or* a settlement in which the insurer has assumed the risk of nonliability (as explained in Comment *e* that Defendants rely on to support their argument of a voluntary payment) a finding in favor of finality is supported. *Id*. Comment *f* then explains that "some kinds of mistakes by insurers are more likely to support a claim in restitution than others. The relevant types of mistake from this perspective may be organized in three categories:" (1) mistake as to coverage; (2) mistake as to the extent of a covered loss; and (3) mistaken belief that a covered loss has occurred. *Id*.

The third category, mistaken belief that a covered loss has occurred, explicitly addresses "the payment of life insurance proceeds on the basis of prolonged disappearance rather than actual proof of death." *Id*. at § 6 cmt. f(3). While courts have sometimes found the insurer assumed the risk of nonliability, the circumstances of these "cases typically present a number of [ ] considerations favoring restitution." *Id*. The first consideration cited in Comment *f* is when the "claim has been paid at face value, there has been no explicit compromise with the policyholder on the issue of liability." *Id*. "The context of the insurer's decision to pay or deny the claim is frequently one in which the policy of encouraging prompt payment through liberal restitution is at its strongest." *Id*. This is precisely what has happened in this case, Liberty Life paid the full value of Eric's policy after it unequivocally determined that Eric was dead. There was no attempt by Liberty Life to settle, compromise, indemnify, or have Defendants assume the risk if Eric returned alive.

Illustration 28, intended to expound upon Comment *f*, explicitly addresses similar facts to this case.

> 28. A's life is insured with B Company for the benefit of C. After A is reported missing and presumed lost in a wartime naval battle, the United States issues a certificate of A's presumptive death. On receipt of this certificate, B pays

> C the face value of the policy.  A returns home from an enemy prison camp.  The court determines that, in settling B's claim, *neither B nor C regarded the fact of A's death as uncertain*.  B is entitled to restitution of the payment.  Compare Illustration 19.

*Id.* at § 6 cmt. f, illus. 28 (emphasis added).  Neither Defendants nor Liberty Life regarded the fact of Eric's death as uncertain when Liberty Life paid the Death Benefit Proceeds, in other words there was no recognized uncertainty.

Illustration 28 directs the reader to compare it with Illustration 19.  Defendants have also directed the Court to Illustration 19 to support their claim for a voluntary payment and a factor limiting restitution.  (Doc. 253 at 8-9).

Illustration 19 further develops Comment *e* to section 6.  While Comment *f* fully explains insurance claims, Comment *e* illustrates the voluntary payment rule, one of the few factors recognized to limit restitution in a mistaken payment.  Under this rule "money voluntarily paid with knowledge of the facts cannot be recovered back."  Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. e.  Comment *e*, however, only applies this rule to limiting "restitution claim[s] to recover a payment in excess of an underlying liability."  *Id.*  Liberty Life had no underlying liability to Erin and Kirsten as the facts bore out when Eric returned alive.  Further, while Illustration 19 deals with the same parties as Illustration 28 and this case, Illustration 19 predicates the insured's death on being recognized as uncertain.  *Id.* at § 6 cmt. e, illus. 19.  Illustration 19 reads:

> A's life is insured with B Company for the benefit of C.  A disappears and is not heard from for seven years.  C obtains a certificate of presumptive death and claims payment under the policy.  B offers to pay the death benefit in exchange for C's undertaking to repay the proceeds should A be found alive.  C rejects B's offer and threatens suit if the claim is not paid unconditionally.  In a suit by C, the certificate of A's presumptive death would be sufficient—in the absence of evidence to the contrary—to support a finding of B's liability.  Choosing to avoid the cost of further investigation and litigation, B pays C in full.  A is then discovered alive.

> *Because the fact of A's death was recognized to be uncertain*,
> B is not entitled to recover the payment on the ground of
> mistake.  Compare Illustration 28, infra.  (If either A or C
> induced the settlement by fraudulently concealing A's
> whereabouts, the settlement may be rescinded and the
> payment recovered under the rule of § 13.)

*Id*. (emphasis added).  The difference between this illustration and Illustration 28 is recognized uncertainty.  The Restatement explains that this illustration is based on three cases where the insurer made a conscious election to pay a doubtful claim.  *Id*. at reporter's note e (citing *New York Life Ins. Co. v. Chittenden & Eastmen*, 112 N.W. 96 (Iowa 1907); *Kansas Farm Bureau Life Ins. Co. v. Farmway Credit Union*, 889 P.2d 784 (Kan. 1995); and *Meeme Mut. Home Protective Fire Ins. Co. v. Lorfeld*, 216 N.W. 507 (Wis. 1927)).  Unlike Illustration 19 and the cases it was based on, and similar to Illustration 28, in this case, neither Liberty Life nor Defendants regarded the fact of Eric's death as uncertain when Liberty Life paid the claim in 1998.

After investigating the claim, Liberty Life stated it had no doubt as to Eric's death. (Doc. 229-3 at 52).  Defendants have proffered no evidence that Liberty Life regarded the fact of Eric's death as uncertain when it finally decided to pay the Death Benefit Proceeds.  To the contrary, following no less than three other investigations and after Liberty Life had conducted its own investigation (Doc. 229-2 at 1-85) into Eric's death, according to Defendants' own Statement of facts, "[o]n January 26, 1998, Liberty Life wrote Lincoln [one of Liberty Life's reinsurers] that it had decided to pay the claim *because a presumptive death certificate had been issued, there was no proof that [Eric] was still alive*, and further investigation could create the appearance of bad faith, lack of fair dealing, or unfair claims practices." (Doc. 254 at 9 ¶ 13) (emphasis added).  Looking at this statement in the light most favorable to Defendants, at best, it is merely colorable and not significantly probative.  This is not enough to preclude the Court from granting summary judgment.  *See Anderson*, 477 U.S. at 249-250.

Defendants' statement of facts, at best, establishes uncertainty about Liberty's investigation on the part of Lincoln National Reinsurance Company.  (Doc. 254 at 7-8 ¶

10, 12).  Lincoln National Reinsurance, however, is not Liberty Life, is not the insurer that paid the Death Benefit Proceeds, and is not a party to this suit.  Further, Defendants admit that Liberty Life paid the claim without attempting to secure any kind of reimbursement or indemnity agreement from Donald if Eric was later discovered alive.  (Doc. 254 at 9 ¶ 14).  This actually supports the Courts finding for Plaintiff because Liberty Life's decision supports the policy in favor of the liberal availability of restitution.  *See* Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. f.  The Court finds the statements cited by Defendants taken with the multiple investigations into Eric's death make it clear that there is no genuine issue over a recognized uncertainty, neither Liberty Life nor Defendants regarded Eric's death as uncertain unlike the example in Illustration 19.

More importantly, even if there was a genuine issue of material fact as to whether Liberty Life was uncertain about Eric's death, Defendants' reliance on Illustration 19 is explicitly undermined by section 13 to the Restatement.  The last sentence of Illustration 19 reads, "[i]f either [the insured] or [the beneficiary] induced the settlement by fraudulently concealing [the insured's] whereabouts, the settlement may be rescinded and the payment recovered under the rule of § 13."  Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. e, illus. 19.  Under section 13, "[a] transfer induced by fraud or material misrepresentation is subject to rescission and restitution.  The transferee is liable in restitution as necessary to avoid unjust enrichment."  *Id*. at § 13(1).

Erin and Kirsten argue that this disclaimer to Illustration 19 does not apply to Liberty Life's claim against them for two reasons: (1) because Plaintiff's fraud claim against Eric is not determinable as a matter of law; and (2) Arizona's statute of repose in A.R.S. § 14-1106, bars Liberty Life's claim against them.

As the Court has explained above, Liberty Life's claim of fraud is in fact determinable as a matter of law, as the Court found the material facts showed Eric had committed the tort of fraudulent concealment.  *See supra* Part III.  This alone would preclude Erin and Kirsten's argument that Illustration 19 shows their receipt of the

Proceeds was a "voluntary payment" by Liberty Life under Comment *e*.  However, even without the fraud claim, under Comment *f*, as the Court has explained, Liberty Life is entitled to restitution.

Turning to Erin and Kirsten's argument that the statute of repose in A.R.S. § 14-1106, bars Plaintiff's recovery, the statue of repose reads:

> If fraud has been perpetrated in connection with any proceeding or in any statement *filed under this title* or if fraud is used to avoid or circumvent the provisions or purposes *of this title*, any person injured thereby may obtain appropriate relief against the perpetrator of the fraud or restitution from any person, other than a bona fide purchaser, benefiting from the fraud, whether innocent or not.  Any proceeding must be commenced within two years after the discovery of the fraud, but no proceeding may be brought against one not a perpetrator of the fraud later than five years after the time of commission of the fraud. This section has no bearing on remedies relating to fraud practiced on a decedent during his lifetime which affects the succession of his estate.

A.R.S. § 14-1106 (emphasis added).  Defendants focus on the penultimate sentence, "no proceeding may be brought against one not a perpetrator of the fraud later than five years after the time of commission of the fraud."  (Doc. 253 at 11).  Defendants' focus, however, fails to account for the first sentence that this statute applies to any fraud "perpetrated in connection with any proceeding . . . filed under this title or if fraud is used to avoid . . . the provisions or purposes of this title."  A.R.S. § 14-1106.  Title 14 and the Uniform Probate Code at § 1-106 upon which Title 14 is based concern probate proceedings.  In this case, Liberty Life's payment of Death Benefit Proceeds was not made in connection with any probate proceedings concerning Eric's estate or in connection with any proceeding under Title 14.  Therefore the statute of repose in Title 14 is inapplicable.

In addition, as the purposes of Title 14 state, "[t]his title shall be liberally construed and applied to promote its underlying purposes and policies."  A.R.S. § 14-1102.  Even if the proceeding was under Title 14, liberal application of this Title would

compel the Court to find that the fraud was committed until 2007 when Eric made the decision to reappear in society.  This case was filed against Erin and Kirsten on September 21, 2010, well within the five year limit.  (*See* Doc. 1).  Rigid application of this statute would undermine the purposes and policies of Title 14 and allow Defendants to be unjustly enriched.

### B.    Conscious Ignorance is Inapplicable because it depends on Recognized Uncertainty

Comment *b* of section 5 describes when the claimant bears the risk of mistake. Comment *b(2)* further explains that conscious ignorance is one of these times when the claimant bears the risk of mistake and is not entitled to restitution.  Conscious ignorance is when a claimant assumes "the risk of a potentially invalidating mistake by a unilateral decision to act in conscious ignorance of relevant circumstances.  The usual setting of such a transaction is the claimant's decision to satisfy a doubtful claim, in the face of a *recognized uncertainty* as to the underlying liability."  Restatement (Third) of Restitution & Unjust Enrichment § 5 cmt. b(2) (emphasis added).  "The decision to act in such a case rests on a determination that the anticipated costs of resisting the claim outweigh the cost of settlement; a party that acts on the basis of such a calculation may be said to have assumed the risk that the calculation, depending as it does on a comparison of unknowns, will be revealed to be wrong."  *Id*.  As the Court explained above, the key difference between conscious ignorance and the case at bar is that Liberty Life's decision to pay the Death Benefit Proceeds was not based on a recognized uncertainty and was not a settlement made in light any uncertainty.  The record establishes that Liberty Life was mistakenly certain about Eric's death.  Defendants have not proffered any evidence drawing this issue of material fact into dispute.

## V.    CONVERSION CLAIM AGAINST DONALD

Liberty Life claims Donald committed an act of conversion by distributing the remaining Death Benefit Proceeds from the beneficiary Trusts, a total of $478,651, to Erin and Kirsten with full knowledge that Eric was alive.  (Doc. 1 at 18-19); (Doc. 228 at

15).  Liberty Life asks the Court to grant summary judgment on this claim.  (Doc. 228 at 16).  There is no genuine dispute as to any of the material facts relevant to Plaintiff's conversion claim and the Court is left solely with questions of law.

Under Arizona law, conversion is "an act of wrongful dominion or control over personal property in denial of or inconsistent with the rights of another."  *Case Corp. v. Gehrke*, 91 P.3d 362, 365 (Ariz. Ct. App. 2004) (citation omitted); *see also Autoville, Inc. v. Friedman*, 510 P.2d 400, 402 (1973) ("The gravamen of [conversion] is [ ] the wrongful interference with another's ownership or right of possession." (citations omitted)).  "To maintain an action for conversion, a plaintiff must have had the right to immediate possession of the personal property at the time of the alleged conversion."  *Case Corp*., 91 P.3d at 365; *Empire Fire & Marine Ins. Co. v. First Nat. Bank*, 26 Ariz. App. 157, 159 (Ariz. Ct. App. 1976) ("In order to maintain an action for conversion the plaintiff must show that at the time of the conversion he was in possession of the property or was entitled to the immediate possession thereof.").

Liberty Life asserts that money can be converted.  (Doc. 228 at 16).  "At early common law there was some question as to whether money could be the subject of a conversion because of its lack of specific identification."  *Autoville*, 510 P.2d at 402 (citation omitted).  "However, the modern rule, in which Arizona joins, is that money can be the subject of a conversion provided that it can be described, identified or segregated, and an obligation to treat it in a specific manner is established."  *Id.*

Money is not the proper subject of a conversion claim when the claim is used merely "to collect on a debt that could be satisfied by money generally."  *Case Corp*., 91 P.3d at 365; *see also Autoville*, 510 P.2d at 403.  "When there is no obligation to return the identical money, but only a relationship of debtor or creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor."  *Lyxell v. Vautrin*, 604 F.2d 18, 21 (5th Cir. 1979) (relying on Alabama case law); *High View Fund, L.P. v. Hall*, 27 F. Supp. 2d 420, 429 (S.D.N.Y. 1998) ("[A]n action for conversion of money will lie only where there is an obligation to return the identical money delivered

1    by the plaintiff to the defendant." (citing Delaware case law)).

2          Thus, under Arizona law the Court must determine, if the undisputed facts show:

3    (1) that Plaintiff had a right to immediate possession of the Proceeds; (2) that the funds

4    Plaintiff seeks are described; (3) that the funds Plaintiff seeks are identified or

5    segregated; and (4) that Donald had an obligation to treat the funds in a specific manner.

6          **A.     Right to Immediate Possession**

7          To maintain a claim for conversion the Plaintiff must have had an immediate right

8    to possession of the property.  *Case Corp*., 91 P.3d at 365.  The basis of Plaintiff's

9    argument is that Liberty Life had a right to the funds in the Trusts in January 2008, when

10   Donald exercised control over the funds and distributed them to Erin and Kirsten.  (Doc.

11   261 at 16).

12         Defendant argues Plaintiff's conversion claim fails because Plaintiff cannot

13   demonstrate it was entitled to immediate possession of the Proceeds in January 2008.

14   (Doc. 251 at 5,6).  To support this argument, Defendant contends that in January 2008

15   Plaintiff's money was not the only source of funds in the Trusts and ten years had passed

16   since Plaintiff paid out on Eric's life insurance policy.  (*Id*. at 6).  Further, Defendant

17   argues Plaintiff did not have a secured interest in the funds establishing Plaintiff's right to

18   immediate possession.  (*Id*.)

19         As an initial matter, the Court notes that there is no requirement under Arizona

20   law for a Plaintiff to have a secured interest in property to establish a right to immediate

21   possession.  A security interest is one way of establishing this right.  The requirement is

22   merely that a plaintiff has a right to immediate possession at the time of conversion.

23   *Sears Consumer Fin. Corp. v. Thunderbird Prod.*, 802 P.2d 1032, 1034 (Ariz. Ct. App.

24   1990) (citing *Restatement (Second) of Torts* § 243 cmt. b).

25         The undisputed facts show that Donald knew Eric was alive as of October 2007.

26   (Doc. 252 at 4 ¶ 25).  As of October 2007, Donald knew Plaintiff may have a claim to the

27   trust money.  Donald received at least four emails from Anne Myers discussing whether

28   Plaintiff had a right to the money and if it was safe to disburse the money.  (*Id*. at ¶ 26).

After Eric's reappearance, Erin stated in her deposition that Donald decided he was not going to disburse any more money from the Trusts while they were trying to determine how Eric's existence would affect the Trusts. (Doc. 229-4 at 54-56). Then, in January 2008 and April 2009, and in disaccord with the terms of the trust agreements, Donald decided to distribute the remaining money in the Trusts to Erin and Kirsten. (Doc. 252 at 5 ¶ 31). Plaintiff did not learn about Eric's reappearance until November 2009. (Doc. 229 at 6 ¶ 33).

The Court finds Plaintiff had a right to the remaining funds in January 2008. Defendant's argument that the funds were distributed from Plaintiff to the Trusts ten years prior is irrelevant. As of October 2007, Donald knew he held control over funds that were paid for the death of Eric Myers, but Eric Myers was not dead. Donald knew Plaintiff could have a claim to the money but he came to the wrong conclusion—that he "was safe to give the girls their trust money." (Doc. 229 at 6). Plaintiff had a right to possession of this money when it was undisputed that Eric Myers was alive. Accordingly, Plaintiff had a right to the money in January 2008 when Donald distributed the Proceeds.

### B.    The Money Must be Described

If money is the subject of a conversion claim, the actual money at issue must first be described. *Case Corp.*, 91 P.3d at 365. Plaintiff has clearly described the personal property at issue as the $478,651 remaining in the Trusts as of January 2008. This amount is what was left from the original $870,103.80 that Plaintiff erroneously paid to the Trusts pursuant to Eric's Death Benefit Policy in 1998. The Court finds Plaintiff has adequately described the money at issue to fulfill this requirement.

### C.    The Money Must be Identified or Segregated

When money is the subject of a conversion claim it must also be identified or segregated. *Case Corp.*, 91 P.3d at 365. The critical question here is whether this is a suit on a debt or if it amounts to conversion of a segregated account or an account containing identifiable funds. *Id.*

Plaintiff argues that the money in the Trusts is identifiable for conversion purposes because "all of the money deposited in the Trusts came from the Death Benefit Proceeds or income earned on the Death Benefit Proceeds." (Doc. 261 at 16). Defendant admits this as well. (*Id.*) Plaintiff's argument is essentially that investing and loaning out parts of the Proceeds and depositing the repayments and interest earned with the original Proceeds does not destroy the segregation nor the identifiability of the Proceeds overall. Plaintiff, however, does not cite any examples directly supporting this argument. To make Plaintiff's point, Plaintiff contrasts the funds here with the funds at issue in *Universal Marketing and Entertainment, Inc. v. Bank One of Arizona*. In *Universal Marketing*, the Arizona Court of Appeals held that a deposit into an unrestricted bank account that included other separate deposits had the effect of comingling the property and made it unidentifiable for conversion purposes. *Univ. Mktg. & Entm't, Inc. v. Bank One of Arizona, N.A.*, 53 P.3d 191, 194 (Ariz. Ct. App. 2002).

Defendant argues that because the Death Benefit Proceeds were comingled with interest earned and loan repayments from the Proceeds, the identifiability of the Proceeds for purposes of conversion is destroyed. (Doc. 251 at 9). Like Plaintiff, Defendant does not cite a single example, direct or by comparison, supporting this contention. Consequently, the Court is left with competing conclusory statements.

The Court is unaware of any cases with similar facts. As Plaintiff pointed out, this case is distinguishable from *Universal Marketing*. *See Universal Mktg.*, 53 P.3d at 194 (funds at issue had been deposited into an unrestricted bank account that already included separate funds). In this case, the Death Benefit Proceeds were not added to existing funds in an unrestricted bank account. The Proceeds were segregated into two distinct trusts—the Erin Myers Trust and the Kirsten Myers Trust. (Doc. 229 at 3 ¶ 15). Upon their creation, the Trusts consisted entirely of the Death Benefit Proceeds. (Doc. 252-1 at 53 ¶ 5). The only changes to the composition of the original Proceeds by January 2008, consisted of loan repayments from the Proceeds, interest made from the loans, and returns on investments made from the Proceeds. (Doc. 252 at 3-4 ¶ 19). Given the

1  unique facts of this case and these trusts in particular, the Court finds Plaintiff has met its

2  burden of showing that the money at issue here was segregated.

3      Arizona law requires money to be *either* segregated or identifiable for purposes of

4  conversion.  *Case Corp.*, 91 P.3d at 365 (emphasis added).  In this case, however, the

5  money is also identifiable.  In an unpublished opinion, the Arizona Court of Appeals said

6  "it is the ability to identify the subject funds at a given point in time through examination

7  of the business records that creates a legitimate basis on which to assert and prove the

8  claim of conversion."  While the Court may not cite an unpublished decision by Arizona

9  state courts in interpreting Arizona law, the Court finds this language correctly states the

10  law in Arizona.

11      In this case, Plaintiff has identified the full $478,651 remaining in the Trusts as of

12  January 2008, as the money converted by Defendant.  From an equality standpoint,

13  Plaintiff was unjustly denied the dominion or control over much more than the amount at

14  issue.[1]  Justice aside, and looking only to the factors Arizona law considers, the Court

15  finds that the Proceeds did not become obscured and unidentifiable as a whole simply

16  because Donald unilaterally loaned parts of the Proceeds out and added the interest made

17  from the Proceeds.

18      A secured party's interest in specific funds is not cancelled when a debtor

19  unilaterally comingles specific funds with other funds.  *See* A.R.S. § 47–9315(B) (2)

20  [2003] ("Proceeds [that are not goods] that are commingled with other property are

21  identifiable proceeds . . . to the extent that the secured party identifies the proceeds by a

22  method of tracing, including application of equitable principles, that is permitted under

23  law . . . with respect to commingled property of the type involved.").  The difference

24  here, in addition to the fact that Plaintiff is not a secured party, is that Plaintiff claims

25  ownership over both the original funds and the funds added to the original funds.  In

26

27  _____

[1] Plaintiff paid out $870,103.80 on the death benefit policy of someone who was not dead.
Plaintiff only seeks the $478,651.00 that remained from these segregated and identifiable
28  funds when it became clear to the controller of those funds that Plaintiff may have a claim
to the funds.

shaping the law for conversion in Arizona, the Court of Appeals of Arizona quoted Texas law in *Universal Marketing*, stating

> Elaborating on the means of identifying funds as a specific chattel, the Texas court observed that an action for conversion of money would lie . . . "where it is delivered for safe keeping, to which the keeper claims no title and which money is required and intended to be kept segregated, *substantially in the form in which it was received* or as an intact fund."
>
> . . .
>
> Arizona law has long been to the same effect.

*Universal Mktg.*, 53 P.3d at 194 (emphasis added) (quoting *Houston Nat'l Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. Civ. App. 1981)).  The Court finds the Proceeds in the Trusts were kept "substantially in the form in which it was received."  The character and origin of all the funds in the Trusts were essentially the same.  Donald's argument against conversion would be stronger if unrelated funds had been added to the original Proceeds and made up part of the $478,651 that Plaintiff lays claim to, or if loan repayments and interest payments made the amount Plaintiff lays claim to greater than the original $870,103.80 that Plaintiff erroneously gave Donald.  However, none of these scenarios have happened.  Plaintiff's ownership interest in the total funds in the Trusts was not cancelled because interest and payments from loans, made from the original funds, were added.  The Court finds Plaintiff has sufficiently identified the specific Proceeds converted.

Further, even without a security interest Plaintiff's conversion claim is not invalid.  When money is the property at issue in a conversion claim, a security interest provides a means of identifying the specific money.  *Case Corp.*, 91 P.3d at 367 ("In a case like *Autoville* or *Universal Marketing*, it is entirely correct to assert that without some further means of identifying the proceeds at issue, such as segregation, no conversion action would lie.  The same is not true here, where the security interest itself provides the additional method of identifying the specific proceeds at issue.").  In *Case Corp.*, there was a security interest in the funds that served to identify the specific proceeds, so the

fact that the funds were then comingled did not destroy the conversion claim.  *Id*.  In *Autoville*, there was no security interest or ownership in the property that identified the specific proceeds, the only relationship in *Autoville* was debtor and creditor.  *Autoville*, 510 P.2d at 404.

The money at issue here was not a debt that Donald owed Liberty Life.  The money here originally belonged to Liberty Life, Liberty Life erroneously entrusted it to Donald, when Donald became aware of the mistake he chose to exercise his own dominion and control over the money in order to prevent Liberty Life from getting it back.  Donald directly interfered with Plaintiff's right of possession.  The Court finds that for purposes of conversion, the Proceeds were segregated and identified by Plaintiff.

### D.   Obligation to Treat in Specific Manner

Finally, when money is the subject of a conversion claim an obligation to treat the money in a specific manner must be established.  *Autoville*, 510 P.2d at 402.  Plaintiff argues an obligation for Donald to treat the money in a specific manner was established when Donald asked Plaintiff to pay the Death Benefit Proceeds to the Trusts and subsequently received the Proceeds as the trustee for the Trusts.  (Doc. 261 at 17-18).  Donald argues that "[t]here is no evidence that Liberty paid the insurance proceeds under any sort of reservation of rights to recover the money if Eric was discovered alive at any point in the future."  (Doc. 251 at 9).  The central question before the Court is whether a defendant in a conversion claim must owe an obligation to the plaintiff specifically or whether a defendant can merely owe an obligation to treat the money in a specific manner.

The Court first looks to the clear language of the rule.  In the cases cited by the parties, Arizona Courts consistently explain the obligation as merely an obligation to treat the money in a specific manner.  *See Autoville*, 510 P.2d at 402; *Case Corp*., 91 P.3d at 366 (quoting *Autoville*, 510 P.2d at 402).  No requirement is expressed by Arizona courts narrowing the rule and demanding that the obligation be to the party making the conversion claim.

The Court acknowledges another judge in this Court's decision in *Cellco Partnership v. Hope*, where the district court, applying Arizona law, denied a conversion claim because no obligation was established between the parties.   In *Cellco*, the defendant made a counter claim against the plaintiff alleging an act of conversion.   The district court, however, found that the defendant had failed to allege enough facts to show that the plaintiff had an obligation to defendant to treat the funds at issue in a specific manner or even that the plaintiff had any contractual obligation to pay the defendant. *Cellco P'ship v. Hope*, No. CV11–0432, 2012 WL 260032, at *18 (D. Ariz. Jan. 30, 2012).   The facts in *Cellco*, however, are not the same as this case.   In *Cellco*, the defendant tried to allege that plaintiff had an obligation to defendant but failed to allege enough facts to show the obligation existed.   There is nothing in the *Cellco* decision to imply that had defendant alleged enough facts to merely show an obligation existed for plaintiff to treat the money in a specific manner that the requirement for a conversion claim would not have been fulfilled.

In this case, Plaintiff argues that Donald received the Death Benefit Proceeds as the trustee for the trusts, and his position as trustee established the obligation to treat the funds in a specific manner.  (Doc. 261 at 16).   In *Universal Marketing*, the Court of Appeals of Arizona recognized that under Arizona law "an action for conversion of money would lie where the money . . . is delivered for safe keeping, to which the keeper claims no title . . . ."   *Universal Mktg.*, 53 P.3d at 194 (quoting Texas law).   Further, "Arizona law requires the trustee to follow the instructions of the trust instrument." *Minn. Title Co. v. Cong. Indus.*, 570 P.2d 491, 493 (1977) (citing *Valley Nat'l Bank v. Hartford Accident & Indem. Co.*, 136 P.2d 458, 459 (1943)).   Donald was the trustee of the Trusts.   The trust instrument established that Donald had an obligation to "hold the Trust Estate subject to the provisions hereinafter contained."   (Doc. 229-3 at 55).   As trustee, Donald claimed no title to the money and was delivered the money, by Plaintiff, for safe keeping, for the benefit of Erin and Kirsten.   The Court finds under the clear language used by Arizona courts, that under Arizona law, Donald had an obligation to

treat the funds in the trust in a specific manner.  Therefore, because Plaintiffs have established that Donald had an obligation to treat the money in a specific manner, Plaintiffs have fulfilled the final requirement for a conversion claim under Arizona law.

Plaintiff has shown that it has an immediate right to possession of the Proceeds. Plaintiff has sufficiently described the Proceeds.  Plaintiff has identified the Proceeds and shown that they are segregated.  Finally, Plaintiff has established that Donald had an obligation to treat the Proceeds in a specific manner.  Accordingly, Plaintiff fulfilled the requirements under Arizona law to show a conversion claim and is entitled to judgment as a matter of law.

**VI.    CONCLUSION**

Based on the foregoing,

**IT IS ORDERED** granting Plaintiff's Motion for Partial Summary Judgment in its entirety.  (Doc. 228).  Specifically, the Court grants Plaintiff's motion for summary judgment on Plaintiff's fraud claim against Defendant Eric L. Myers, on Plaintiff's unjust enrichment claim against Defendants Erin Sarah Stoloff and Kirsten Anne Ruggiano, and Plaintiff's conversion claim against Defendant Donald D. Myers.

**IT IS FURTHER ORDERED** within twenty (20) days Plaintiff shall file a status report of what claims, if any remain for trial and against which defendants (on a claim by claim basis).  If no claims remain, within this deadline, Plaintiff shall submit a proposed form of judgment.

Dated this 11th day of February, 2013.

James A. Teilborg
United States District Judge